NUMBER 13-05-705-CR 


 

COURT OF APPEALS



THIRTEENTH DISTRICT OF TEXAS



CORPUS CHRISTI - EDINBURG 


 


JENNY H. EISENMAN, Appellant,


v.



THE STATE OF TEXAS, Appellee.

 


On appeal from the 177th District Court 

of Harris County, Texas

 


MEMORANDUM OPINION


Before Chief Justice Valdez and Justices Rodriguez and Garza


Memorandum Opinion by Justice Rodriguez



 Appellant, Jenny H. Eisenman, was indicted for the offense of murder. See
Tex. Penal Code Ann. § 19.02 (Vernon 2003). She entered a plea of "not guilty." 
After the jury rejected appellant's justification theories, (1) it found her guilty of murdering
her husband, Andrew Thomas Eisenman (Eisenman). During the punishment phase,
the jury found that appellant did not cause her husband's death under the immediate
influence of sudden passion and assessed punishment at 23 years in the Institutional
Division of the Texas Department of Criminal Justice. By 11 points of error, appellant
complains that the evidence is insufficient to support her conviction, that appellant
established her sudden passion claim by a preponderance of the evidence, that the
trial court erred in refusing to admit certain testimony and evidence, and that the trial
court erred in denying her motion for mistrial and her motion new trial. We affirm.

I. Background

 Appellant and Eisenman married in 1999. Appellant testified that problems
arose four to five months after they were married, and that, during 2002, their
marriage was "strained." The Eisenmans' son was born in September 2003, and
early in 2004, appellant and Eisenman decided to separate. Appellant filed for
divorce in March 2004. On May 27, 2004, after taking their son to the doctor,
Eisenman went to appellant's apartment where they argued. Allegedly in self-defense
or in defense of their son, appellant shot and killed Eisenman. Appellant was arrested
and later convicted of murder. This appeal ensued.

II. Sufficiency of the Evidence to Establish Intent

 In her first two points of error, appellant claims that the evidence is legally and
factually insufficient to support her murder conviction. Appellant specifically challenges
the intent element of the offense, see id. § 19.02(b)(1)-(2) (Vernon 2003), and the jury's
rejection of her self-defense claim. See Act of May 27, 1995, 74th Leg., ch. 235, § 1
(amended 2007) (current version at Tex. Penal Code Ann. § 9.32(a)(2)(A) (Vernon
Supp. 2007)). Appellant does not otherwise challenge the sufficiency of the evidence
at the guilt phase.

A. Standard of Review and Applicable Law

1. Legal Sufficiency

 In assessing the legal sufficiency of the evidence to support a criminal
conviction under Jackson v. Virginia, we consider all of the evidence in
the light most favorable to the verdict and determine whether, based on
that evidence and reasonable inferences therefrom, a rational juror could
have found the essential elements of the crime beyond a reasonable
doubt.


Rollerson v. State, 227 S.W.3d 718, 724 (Tex. Crim. App. 2007) (citing Hooper v. State,
214 S.W.3d 9, 13 (Tex. Crim. App. 2007)); Jackson v. Virginia, 443 U.S. 307, 318-19
(1979). Reconciliation of conflicts in the evidence is within the exclusive province of
the jury. See Mosley v. State, 983 S.W.2d 249, 254 (Tex. Crim. App. 1998). "When
reviewing the evidence, our role is not to become a thirteenth juror. This Court may
not re-evaluate the weight and credibility of the record evidence and thereby
substitute our judgment for that of the fact-finder." Dewberry v. State, 4 S.W.3d 735,
740 (Tex. Crim. App. 1999). An appellate court, faced with a record of historical facts
that supports conflicting inferences, must also presume--even if it does not
affirmatively appear in the record--that the trier of fact resolved any such conflicts in
favor of the prosecution, and must defer to that resolution. Jackson, 443 U.S. at 326;
see Turro v. State, 867 S.W.2d 43, 47 (Tex. Crim. App. 1993).



2. Factual Sufficiency

 "Evidence is factually insufficient to support the verdict if it is clearly wrong or
manifestly unjust or against the great weight and preponderance of the evidence." 
Rollerson, 227 S.W.3d at 724 (citing Marshall v. State, 210 S.W.3d 618, 625 Tex. Crim.
App. 2006)); see Johnson v. State, 23 S.W.3d 1, 11-12 (Tex. Crim. App. 2000). 
"Unless the available record clearly reveals a different result is appropriate, an
appellate court must defer to the jury's determination concerning what weight to give
contradictory testimonial evidence because resolution often turns on an evaluation of
credibility and demeanor, and those jurors were in attendance when the testimony
was delivered." Johnson, 23 S.W.3d at 8. Both standards require the reviewing court
to consider all of the evidence. Rollerson, 227 S.W.3d at 724.

3. Elements of the Offense

 We measure the legal sufficiency of the evidence by the elements of the offense as
defined by the hypothetically correct jury charge. Malik v. State, 953 S.W.2d 234, 240
(Tex. Crim. App. 1997). We also apply a hypothetically correct jury charge analytical
construct in the context of a factual-sufficiency review. Adi v. State, 94 S.W.3d 124, 131
(Tex. App.-Corpus Christi 2002, pet. ref'd). "Such a charge would accurately set out the
law, would be authorized by the indictment, and would not unnecessarily increase the
State's burden of proof." Malik, 953 S.W.2d at 240. Under a hypothetically correct jury
charge, the elements of murder pursuant to section 19.02(b)(1) are: (1) intentionally or
knowingly, (2) causing the death, (3) of an individual. See Tex. Penal Code Ann. §
19.02(b)(1) (Vernon 2003). Also, pursuant to section 19.02(b)(2) the elements of murder
are (1) intentionally, (2) causing serious bodily injury, and (3) committing an act clearly
dangerous to human life, (4) causing the death, (5) of an individual. See id. § 19.02(b)(2)
(Vernon 2003).

 Intent and knowledge are fact questions for the jury, and are almost
always proven through evidence of the circumstances surrounding the
crime. Robles v. State, 664 S.W.2d 91, 94 (Tex. Crim. App. 1984);
Mouton v. State, 923 S.W.2d 219, 223 (Tex. App.-Houston [14th Dist.]
1996, no pet.). Intent may be inferred from words and conduct of the
accused. See Hernandez v. State, 819 S.W.2d 806, 810 (Tex. Crim. App.
1991). Intent to kill may be inferred from use of a deadly weapon,
unless in the manner of its use it is reasonably apparent that death or
serious bodily injury could not result. Flanagan v. State, 675 S.W.2d 734,
744 (Tex. Crim. App. 1984); Bell v. State, 501 S.W.2d 137, 138-39 (Tex.
Crim. App. 1973).

Childs v. State, 21 S.W.3d 631, 635 (Tex. App.-Houston [14th Dist.] 2000, pet. ref'd).

4. Justification

 When a justification theory is raised,

 [a] defendant has the burden of producing some evidence to
support a claim of self-defense. Once the defendant produces such
evidence, the State then bears the burden of persuasion to disprove the
raised defense. The burden of persuasion is not one that requires the
production of evidence; rather it requires only that the State prove its
case beyond a reasonable doubt. When a fact finder determines that
the defendant is guilty, there is an implicit finding against the defensive
theory.


Miller v. State, 177 S.W.3d 177, 183 (Tex. App.-Houston [1st Dist.] 2005, pet. ref'd)
(citing Zuliani v. State, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003)). It is well-settled
that when the legal sufficiency of the evidence supporting a fact finder's rejection of
a defense such as self-defense in a murder case is challenged by a defendant,

 "we look not to whether the State presented evidence which refuted
appellant's self-defense testimony, but rather we determine whether
after viewing all the evidence in the light most favorable to the
prosecution, any rational trier of fact would have found the essential
elements of murder beyond a reasonable doubt and also would have
found against appellant on the self-defense issue beyond a reasonable
doubt."


Id. (quoting Saxton v. State, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991) (en banc)). 
The issue of self-defense is a fact issue to be determined by the jury, and a jury is
free to accept or reject the defensive issue, even if the evidence is uncontroverted. 
Hill v. State, 99 S.W.3d 248, 252 (Tex. App.-Fort Worth 2003, pet. ref'd) (citing
Wilkerson v. State, 881 S.W.2d 321, 324 (Tex. Crim. App. 1994) (en banc); Aldelman
v. State, 828 S.W.2d 418, 421 (Tex. Crim. App. 1992) (en banc)). A. Facts

 Appellant testified that on May 27, 2004, she and Eisenman were at her
apartment. According to appellant, they were arguing about items Eisenman had
found there, including his keys, emails described as love letters between Eisenman
and Michelle Weaver, and divorce documents. According to appellant, Eisenman had
a look of rage on his face. He paced around the apartment and pounded his fist into
his hand. Appellant testified that she tried to calm Eisenman; she was scared.

 According to appellant, Eisenman intimidated her; he blocked her efforts to
reach the phone and the door, pushed her to the floor, kicked her repeatedly, and told
her that he was taking his son. Appellant testified that when Eisenman sat down on
the couch she pulled herself up and told him to leave. She was shaking, crying, and
sobbing. Eisenman did not leave, and appellant "thought at this point there was no
way . . . [she was] getting out of [there] . . . to tell [her] story." Appellant went to the
secretary (2) and took out a gun. When she told Eisenman to get out, he was standing. 
Eisenman laughed and said he would use the gun on her. Appellant testified that she
thought she told Eisenman to leave again, but he did not. Appellant stated that she
fired a warning shot that hit the wall above the couch. According to appellant,
Eisenman said, "Bitch," and came at her. Appellant testified that she pointed a
loaded gun at Eisenman and repeatedly shot at him. The evidence established that
Eisenman died of the gunshot wounds.

 Appellant testified that at the moment she shot Eisenman, she was trying to
protect herself and her child, not trying to kill her husband. She felt terror, fear, that
she had no choice--"it was me or it was him." Appellant testified that she did not
know how many times she shot the gun, she fired it until she heard a click, and she
did not know if she was hitting Eisenman or not. She testified that Eisenman fell back
onto the couch. Appellant testified that after she confirmed Eisenman was dead by
checking his pulse and his breathing, she collapsed to the floor. Other testimony
revealed, however, that appellant told the police that, when she pointed the gun at
Eisenman, he threw up his hands, that he was sitting on the couch and laughed and then
she fired, and that she was angry when she shot Eisenman. And, on cross-examination,
appellant testified that she was moving when she fired the gun at Eisenman.

 After killing Eisenman, appellant changed her clothes and washed her face,
hands, and legs. She also put the gun in the pantry. Appellant left the apartment with
her son. She stopped at Wal-Mart, made a list of items--paint, caulk for the wall, and
caulk for a pink countertop--on an envelope, went inside the store, and began buying
things to clean up her apartment. Appellant admitted she did nothing to hide her
identity while purchasing items at Wal-Mart.

 Appellant returned to her apartment and began cleaning, feeling "like a robot." 
She wiped things down, spackled, and painted. Appellant testified that she also took
a green tub from the patio storage area and emptied the contents. She pushed the
tub next to the couch, put Eisenman's legs in the tub, and rolled his body into the tub. 
Appellant placed a sheet over his body and continued to clean the apartment.
Appellant removed Eisenman's body from the apartment by pulling the container with
his body onto the landing and down the stairs to Eisenman's truck that was parked
in the apartment complex lot. According to appellant, she planned to put Eisenman's
body into the truck but was unable to do so. She considered driving Eisenman's body
to another location and leaving it there. Appellant testified that she did not remember
seeing people who saw her and spoke to her while she was beside Eisenman's truck
on the night of the offense. After unsuccessfully attempting to contact her brother,
appellant called her sister, Carrie Harvey, who talked with appellant as she drove
from Katy, Texas, to appellant's apartment. Harvey testified that during the
conversation appellant told her that she was in trouble and that she had messed up
bad, and eventually said that she had shot Eisenman. Appellant told Harvey that she
needed her help to get Eisenman's body into the truck. Harvey repeatedly told
appellant that she should call 911, but appellant did not do so until after her sister
arrived at the apartment. Appellant also testified that she did not call 911 sooner
because she believed someone was already coming to help because someone had
to have heard the shots she had fired.

 The first officers on the scene, including Deputy Floyd Garner, testified that
appellant was very calm and cooperative. She was not crying when they arrived. 
Appellant did not appear to have any visible bruises. (3) The officers noted that the
apartment was unusual in that it was "clean." There were no visible blood splatters
and no signs of anything broken. Everything was in its place, and there were no signs
of violence or struggle. Deputy Garner testified that he did notice one wet spot on the
wall behind the couch. He testified that the spot appeared to be a little round hole
that had been covered with spackle. He went outside the apartment and located an
area of the stairwell wall that appeared to be splintered and also patched with
spackling.

 Deputy Garner agreed that appellant cooperated with deputies during their
investigation. When he asked appellant where the gun was, she said it was in the
pantry. Deputy Garner retrieved the gun and noted the revolver contained six fired
shell casings, meaning that it had been fired six times. Appellant also told an officer
that her husband's body was wrapped in sheets by the truck. The officers located the
body on the ground near the truck. It was wrapped in blankets or sheets and covered
by the overturned container. A baby walker was on top of these items. The officers
observed that Eisenman had received gunshot wounds to his throat, chest, and left
hand. He did not have a pulse. A subsequent analysis of Eisenman's hands revealed
that he did not have any gunpowder residue on his hands. According to Jason
Schroeder, a forensic chemist with the Harris County Medical Examiner's office, this
information established that Eisenman did not fire a gun and that his hands had not
been close enough to the firing of the gun to get gunpowder residue on them.

 After appellant consented to having her apartment inspected, officers found
spattered blood and a bullet hole in the wall above the couch. According to Detective
Marc Reynolds, that blood came from a person who was shot while he was closer to
the wall as opposed to being in the middle of the room. Based on the trajectory of the
bullet from where it entered the wall above the couch to where it hit the exterior wall
of the nearby apartment, the officers determined that the shooter was standing in the
apartment somewhere between the armoire and the balcony and that the gun was
fired downward from that standing position. The hole in the wall above the couch
appeared to have been recently filled in by spackle, putty, or something similar.

 On a bar that separated the living room from the kitchen, there were several
items--including a head visor, Eisenman's wallet, a pair of eyeglasses, and a man's
college class ring. Several documents were recovered from appellant's bedroom
including the following: (1) Eisenman's bank and credit card statements; (2) blank
checks in Eisenman's name; (3) one check filled out in the amount of $767.47 and
made payable to appellant; (4) email correspondence between Eisenman and Weaver
from July 2003 until December 2003, many emails constituting love letters between
the two; (5) telephone records revealing telephone calls between Eisenman and
Weaver from September to December 2003; and (6) email correspondence between
appellant and Kristi Lowery asking Lowery which lawyer she had used and Lowery
responding with a name. A shredder was also discovered in appellant's bedroom. 

 Officers searched appellant's purse and found the envelope on which she had
written her list of items to purchase at Wal-Mart, a checkbook that had belonged to
Eisenman, and a checkbook that belonged to appellant. Two checks had been
written to Wal-Mart on appellant's account May 27, 2004; the first early that afternoon
for sleeping tablets and the second that night to pay for paint, caulk and other items. 
Some of the items were consistent with items found at the scene of the offense. 
Many of the items, however, were not found at the scene or in the apartment
dumpster. Appellant admitted at trial that she had not told the officers about the items
she purchased at Wal-Mart. (4)

 On cross-examination, appellant testified that she felt betrayed, hurt, and
abandoned by Eisenman when she suspected he was having an affair. Appellant
acknowledged that in November 2002 Eisenman found some e-mail correspondence
she had with a male friend. She explained that she received a beating from
Eisenman on the day he found the e-mails, but denied that she had been unfaithful
to Eisenman. In December 2002, appellant and Eisenman went on a family trip to
New Orleans, and in January 2003, appellant learned that she was pregnant. 
According to appellant, Eisenman was not excited about the pregnancy. Appellant
also testified that within four to five months of being married, Eisenman attempted to
engage her in acting out pornographic activity. This activity allegedly continued
through July 2003. According to appellant, non-consensual sexual activity also
continued through 2004. Appellant complained of pornography stored on Eisenman's
computer which he viewed and encouraged her to view but admitted that the
computer which contained this pornography no longer existed. Appellant testified
that, after their separation, appellant continued to beat, rape, and sodomize her. She
allowed Eisenman to visit even after he had sexually assaulted her and had not
requested a protective order when she filed for divorce.

 Appellant admitted telling a detective that she was angry when she shot
Eisenman; anger that turned to fear--fear for her life and that of her child's although
she also told a detective that Eisenman would never hurt their son. She testified that
she shot Eisenman as he was coming at her with deadly force and that she did not
shoot her husband while he was sitting down, and if she had, it would not have been
self-defense. Appellant testified that she fired a warning shot as Eisenman stood up
and that was the shot that went into the wall behind the couch. Everything happened
quickly. Six shots were fired, with two of them found in wall surfaces--one above the
couch and one in the kitchen area. Appellant testified that, after she fired the gun,
Eisenman fell back on the couch.

 Appellant testified that she wanted to clean up what she had done because she
did not want anyone to see that in her apartment. She took her son and went to Wal-Mart to purchase several items in order to "clean up." Appellant also purchased a gas
can at Wal-Mart because Eisenman mentioned earlier in the day that the gas tank in
his vehicle was almost on "empty," and she would need Eisenman's truck because
she planned on putting Eisenman's body in the truck. Appellant also thought about
making Eisenman's death look like an accident.

 Based on the items purchased from Wal-Mart and on the handwritten list
discovered on the envelope in appellant's purse, the officers believed that a recent
attempt had been made to tamper with or alter the scene of the offense. Later,
Detective Reynolds and Deputy Jesus Ortiz returned to appellant's apartment to
determine if any changes had been made to the kitchen countertop. An examination
of appellant's apartment revealed that there was an additional bullet hole in the
kitchen counter, a hole that had been filled with spackle or putty and painted. After
removing the countertop, the officers found a hole in the sheetrock that corresponded
to the hole that had been created in the kitchen counter. They also noted that the
bullet had traveled into the adjacent apartment and recovered the bullet from the wall
in that apartment. Based on the bullet's trajectory, it was determined that the bullet
must have been fired from a gun that was located near the kitchen counter towards
the living room. That gun was also fired at a downward angle. It was also determined
that the gun recovered from appellant's apartment fired the two bullets recovered from
the walls and all of the bullets recovered from Eisenman's body.

 Morna Gonsoulin, M.D., assistant medical examiner, testified that she prepared
the autopsy report in this case. The autopsy revealed that Eisenman died as a result
of gunshot wounds to his neck and abdomen. She opined that the shots fired in the
direction of Eisenman came from a distance of at least 18 inches. There is no
evidence that any of the gunshot wounds received by Eisenman were fired at
extremely close range. None of the wounds were consistent with a front-to-front
confrontation including a direct frontal confrontation as if someone were lunging at
someone.

 On direct, Dr. Gonsoulin testified that the path and location of the gunshot
wounds received by Eisenman revealed that they were most likely inflicted while he
was falling or seated, and that they were most likely inflicted by a shooter who was
in a higher position than Eisenman's body. However, on cross-examination, Dr.
Gonsoulin admitted she could not give a definitive statement as to the position of the
body at the time all of the shots were fired. She admitted that some of the injuries
were in an upward motion contradicting her previous testimony. Dr. Gonsoulin
testified that there were a number of ways that the angles of the bullets, the distance
of the weapon, and the person who was holding the weapon could account for all the
injuries. She also acknowledged, on cross-examination, that there was a wound of
the neck that could be consistent with the victim leaning forward toward appellant.

 Matthew Clements, a forensic firearms examiner with the Harris County
Sheriff's Department, testified that it was his opinion that the bullets recovered from
Eisenman and at the scene were fired from the .38 revolver recovered from
appellant's pantry.C. Analysis

1. Legal Sufficiency In this case, the evidence establishes that Eisenman sat down on a couch after
he and appellant argued. Appellant pulled herself up from the floor, went to the
secretary, and took out a gun. (5) She told Eisenman to get out, he laughed, and said
he would use the gun on her. Appellant stated that she fired a warning shot and then
repeatedly shot Eisenman, firing the gun five more times until she heard a click. 
There is evidence that appellant fired at Eisenman from a standing and moving
position, while he was seated or in a falling position. While the record supports
conflicting inferences, we presume the trier of fact resolved any such conflicts in favor
of the prosecution, and must defer to that resolution. See Jackson, 443 U.S. at 326. 
Moreover, appellant did not fire the gun at close range, suggesting that she and
Eisenman were not struggling over the gun and that Eisenman was not an imminent
threat to appellant at the time he was shot. Appellant did not shoot Eisenman in
direct frontal confrontation as if he were lunging at her. Appellant, herself, testified
that she pointed a loaded gun at Eisenman and repeatedly shot at him. Eisenman
died of those gunshot wounds. The bullets recovered from Eisenman and at the
scene were fired from a gun recovered from appellant's pantry. There is also
evidence that the circumstances surrounding the crime establish that appellant
attempted to conceal the fact that she had killed Eisenman, taking significant actions
in order to cover up that fact. Intent may be inferred from this conduct. See Childs,
21 S.W.3d at 635. Therefore, this constitutes some evidence upon which a rational
jury could conclude beyond a reasonable doubt that appellant intentionally caused the
death of Eisenman by shooting him with a deadly weapon. Thus, legally sufficient
evidence existed to support the jury's verdict of guilty.

 Appellant also claims that the evidence is legally insufficient to support the
jury's rejection of her self-defense claim. She specifically contends that "[t]he only
rational conclusion, based on the facts of the case, is that she shot Eisenman in self-defense, (6) not because she became angry at him for sitting on a couch and laughing
at her." We disagree.

 As set out above, appellant fired multiple shots at Eisenman. There is
evidence that he was seated or falling when the shots were fired and that the wounds
were inconsistent with a direct frontal confrontation. Even if appellant's testimony that
Eisenman was lunging at her were uncontroverted, the jury was free to reject her self-defense claim. See Hill, 99 S.W.3d at 252. The jury also could have concluded that
Eisenman's actions were not so threatening to appellant at that time that she was
justified in repeatedly using deadly force against him. Additionally, appellant did not
immediately call 911 or an ambulance after allegedly shooting Eisenman in self-defense. Instead, she attempted to clean up her apartment and to throw away
evidence. She also moved Eisenman's body out of the apartment in an attempt to
place it in his truck and, by inference, to dispose of it.

 Furthermore, in order to be justified in using deadly force against Eisenman,
appellant must have had a reasonable belief that Eisenman was in the process of
using or attempting to use unlawful deadly force against appellant. See Act of May
27, 1995, 74th Leg., ch. 235, § 1 (amended 2007) (current version at Tex. Penal Code
Ann. § 9.32(a)(2)(A) (Vernon Supp. 2007)). The evidence in this case reveals that
there had been marital problems between appellant and Eisenman and that there
were disagreements between the two that may have resulted in some arguments and
even physical altercations. However, the evidence is, at best, conflicting with regard
to whether Eisenman engaged in any physical abuse of appellant that would have
justified her use of deadly force against him. The jury could have rejected the
defensive evidence and concluded that appellant suffered nothing life-threatening at
the hands of Eisenman at or near the time she repeatedly shot and killed him. See
Hill, 99 S.W.3d at 253. When viewed in the light most favorable to the prosecution,
we conclude that a rational trier of fact would have found beyond a reasonable doubt
that appellant intentionally caused Eisenman's death and that appellant had no legal
justification for killing Eisenman. See Miller, 177 S.W.3d at 183.

 Accordingly, we conclude that the evidence was legally sufficient to support the
jury's verdict of guilty. Appellant's first issue is overruled.

2. Factual Sufficiency

 Also, based upon our review of the entire record, we cannot say that the verdict
was clearly wrong or manifestly unjust or against the great weight and preponderance
of the evidence. See Rollerson, 227 S.W.3d at 724. Although appellant presents
evidence showing that she did not intentionally shoot Eisenman, there exists other
probative evidence that she did. According to her own testimony, at the time
appellant retrieved a gun, Eisenman had stopped kicking her, had stopped assaulting
her in any way, and had sat down on the couch. There is also forensic evidence that
contradicts appellant's testimony that Eisenman stood back up and lunged for her at
the time she shot him. Based on the circumstances and upon what appellant stated
to the police (that she was angry when she shot Eisenman), the jury was entitled to
believe that appellant shot and killed Eisenman out of anger, not fear. The jury was
also entitled to consider appellant's actions following the shooting which included,
among other things, disposing of evidence, not telling her mother what she had done,
and not accepting help from others. Appellant's attempts to eliminate evidence
immediately after the shooting constitute circumstantial evidence of her guilt. See
Miller, 177 S.W.3d at 184.

 We also note that the jury's decision to accept or to reject appellant's claim of
self-defense ultimately hinges on appellant's credibility. See id. And because the
available record does not clearly reveal a different result is appropriate, we must defer
to the jury's determination concerning what weight to give contradictory testimonial
evidence. See Johnson, 23 S.W.3d at 8.

 After reviewing all of the evidence in a neutral light, we conclude that the
State's evidence, taken alone, is not too weak to support the jury's finding of guilt and
rejection of appellant's self-defense claim and that the proof of appellant's guilt is not
against the great weight and preponderance of the evidence. Rollerson, 227 S.W.3d
at 724. Also, based upon our review of the entire record, we cannot say that the
verdict was clearly wrong or manifestly unjust. Id. Accordingly, we conclude that the
evidence is factually sufficient to support the jury's finding of guilt and rejection of
appellant's claim of self-defense. Appellant's second point of error is overruled.

III. Sufficiency of the Evidence to Establish Sudden Passion

 By her third point of error, appellant contends that the jury's failure to find that
in killing her husband appellant acted under the immediate influence of sudden
passion arising from an adequate cause is so against the great weight and
preponderance of the evidence as to be manifestly unjust. At the punishment phase
of trial, the trial court submitted a special issue on sudden passion arising from an
adequate cause. See Tex. Penal Code Ann. § 19.02(d) (Vernon 2003). The jury
rejected appellant's sudden passion claim.

A. Applicable Law and Standard of Review

 "At the punishment stage of a trial, the defendant may raise the issue as to
whether he caused the death under the immediate influence of sudden passion
arising from adequate cause." Id. "Sudden passion" means "passion directly caused
by and arising out of provocation by the individual killed." Id. § 19.02(a)(2). 
"Adequate cause" means "cause that would commonly produce a degree of anger,
rage, resentment, or terror in a person of ordinary temper, sufficient to render the
mind incapable of cool reflection." Id. § 19.02(a)(1). Evidence of the accused's fear
is not enough unless the cause of the fear could produce fear that rises to a level of
terror which makes a person of ordinary temper incapable of cool reflection. Daniels
v. State, 645 S.W.2d 459, 460 (Tex. Crim. App. 1983) (en banc). On appeal, when
appellant challenges the sufficiency of the evidence to support the jury's rejection of
her sudden passion issue where the law has designated that she has the burden of
proof by a preponderance, we apply a factual sufficiency standard of review
considering all the evidence relevant to appellant's issue to determine whether the
judgment is so against the great weight and preponderance of the evidence as to be
manifestly unjust. See Naasz v. State, 974 S.W.2d 418, 421 (Tex. App.-Dallas 1998,
pet. ref'd) (citing Meraz v. State, 785 S.W.2d 146, 154-55 (Tex. Crim. App. 1990) (en
banc)); Garza v. State, 878 S.W.2d 213, 216-19 (Tex. App.-Corpus Christi 1994, pet.
ref'd) (holding there was sufficient evidence from which fact-finder could have
concluded murder was not product of sudden passion arising out of adequate
provocation).

B. Analysis

 Appellant contends that there is overwhelming evidence of sudden passion
caused by the provocation of Eisenman at the time of the offense, including the
following evidence provided by appellant's testimony: (1) Eisenman argued with
appellant; (2) he had a look of rage on his face when appellant returned from buying
food; (3) during appellant's absence, Eisenman found several items and demanded
answers about them when she returned; (4) he pounded his fist into his hand and
called appellant a "bitch"; (5) Eisenman lunged at appellant and blocked her from
using her phone or leaving the apartment; (6) appellant felt trapped and scared; (7)
Eisenman pushed appellant to the floor and threatened to take their son away from
appellant; (8) Eisenman kicked appellant as she lay on the floor; (9) when appellant
demanded that Eisenman leave her apartment, he began to laugh; (10) Eisenman
said he would take the gun from appellant and use it on her; and (11) after appellant
fired a warning shot, Eisenman went toward her, calling her a "bitch."

 Appellant argues that because she was unable to free herself from Eisenman's
assault she was required to use deadly force against him. She testified that she felt
fear and terror--she felt like she had no choice. She stated, "I felt like it was me or
it was him." Appellant argues that sufficient evidence--by a preponderance of
evidence--was submitted to the jury requiring a finding in her favor. Appellant argues
that she was harmed by the jury's rejection of "sudden passion" because she had
never been arrested and would have been eligible for probation, but instead was
sentenced to 23 years in prison.

 In response, the State contends that the jury could have rejected appellant's
claim that she acted under the influence of sudden passion based on the fact that she
was calm at or near the time officers arrived at the scene of the offense. In addition,
earlier, instead of calling the police or an ambulance after shooting and killing
Eisenman, appellant was able to leave her apartment, drive to Wal-mart with her son,
purchase cleaning supplies, return to her apartment and clean it, change clothes, and
dispose of some of the cleaning supplies used to clean the scene of the offense. 
Appellant also attempted to conceal all evidence that there had been a shooting at
the apartment, including an attempt to dispose of Eisenman's body. Appellant then
contacted her sister, but did not call the police until after her sister arrived at the
apartment. Additionally, appellant's own testimony reflects Eisenman stopped kicking
her and sat down on the couch. The physical altercation was over. It was at that time
that appellant went to her secretary, retrieved a gun, and displayed it against
Eisenman. Appellant testified that she fired a warning shot before firing five more
shots killing Eisenman. Finally, appellant testified that there was no way she was
getting out to tell her story, that she had no choice--"it was me or it was him."

 The jury was free to make its own determination of appellant's credibility and
reject appellant's version of events if it did not believe that she was telling the truth. 
See Trevino v. State, 157 S.W.3d 818, 822 (Tex. App.-Fort Worth 2005, no pet.)
(citing Zuniga v. State, 144 S.W.3d 477, 481 (Tex. Crim. App. 2004); Cain v. State, 958
S.W.2d 404, 407 (Tex. Crim. App. 1997)). It could have believed that appellant
repeatedly shot and killed Eisenman out of ordinary anger. The jury could have
believed that appellant did not repeatedly shoot and kill Eisenman while in a state of
mind where she was "incapable of cool reflection." The jury could have believed that
after Eisenman kicked appellant, she had sufficient time to cool off before the
shooting. Appellant's own appraisal of her situation reveals that she had reflected on
it, knew what she had to do, and did it. See Daniels, 645 S.W.2d at 460 (citing Hobson
v. State, 644 S.W.2d 473 (Tex. Crim. App. 1983)). Accordingly, we conclude that the
trial court's finding that appellant was not acting under sudden passion was not
against the great weight and preponderance of the evidence as to be manifestly
unjust. We overrule appellant's third point of error.IV. Omission of Evidence

 By six points of error, appellant contends the trial court erred in excluding
testimony regarding pornography found on Eisenman's computer, an alleged assault,
a videotape of appellant making her statement (without audio), Eisenman's alleged
indifference to her pregnancy, civil lawsuits for child custody and wrongful death filed
by Eisenman's father against appellant, and appellant's medical condition. Appellant
also complains that her constitutional right to present a defense was denied when the
trial court excluded evidence.

A. Standard of Review

 "[T]he trial court should be allowed the discretion to exclude or admit evidence
before the jury and an appellate court should not set aside the trial court's rulings
absent a showing in the record that the trial court has abused that discretion," which
means we review for whether the court's ruling was within the zone of reasonable
disagreement. Montgomery v. State, 810 S.W.2d 372, 379 (Tex. Crim. App. 1990) (en
banc); Yañez v. State, 187 S.W.3d 724, 738 (Tex. App.-Corpus Christi 2006, pet.
ref'd); Whitmire v. State, 183 S.W.3d 522, 528-29 (Tex. App.-Houston [14th Dist.]
2006, no pet.). The reviewing court should uphold the trial court's ruling if there is any
basis to sustain the ruling, even if not the basis upon which the court relied. Whitmire,
183 S.W. 3d at 529 (citing Romero v. State, 800 S.W.2d 539, 543 (Tex. Crim. App.
1990) (en banc)); see Yañez, 187 S.W.3d at 738.

B. Holmes v. South Carolina

 In her supplemental brief, appellant argues that we apply a different standard. 
Appellant asserts that the Supreme Court qualified the abuse of discretion standard
for excluding defense evidence in Holmes v. South Carolina, 126 S.Ct. 1727 (2006),
with the scope of discretion being limited by the defendant's constitutional right to a
meaningful opportunity to present her defense. Appellant asserts that the Holmes
Court did not review the state court's justification for excluding the defendant's
evidence on a mere "abuse of discretion" standard, but instead reviewed it on a
"discretion-as-limited-by-defendant's-constitutional-right-to-present-her-defense"
standard. She urges this Court to apply this new standard of review in this case
where appellant claims her constitutional right to present a defense has been violated
by the trial court's exclusion of certain evidence. We decline to do so.

 What Holmes and decisions coming before it have dealt with are particular rules
that have been applied in a particular defendant's trial that have limited that
defendant's constitutional right to present a defense in that case. See id. at 1731
(citing United States v. Scheffer, 523 U.S. 303, 308 (1998); Crane v. Kentucky, 476 U.S.
683, 689-90 (1986); Marshall v. Lonberger, 459 U.S. 422, 438, n.6 (1983); Chambers
v. Mississippi, 410 U.S. 284, 302-03 (1973); Spencer v. Texas 385 U.S. 554, 564
(1967)). In that respect, Holmes is not a ground-breaking decision, but is merely the
most recent in a long line of decisions where the Supreme Court has determined
whether a rule has improperly limited a defendant's constitutional right to present a
defense in a particular case. See id. at 1734-45. Holmes does not create a new
review standard, as appellant argues.

C. Omission of Testimony Regarding Pornography Found on Computer

 Under her fourth point of error, appellant claims that the trial court erred when
it excluded testimony about pornography found on Eisenman's computer after
previously finding that evidence of pornography was admissible. Appellant claims
that this evidence is admissible under article 38.36(a) of the Texas Code of Criminal
Procedure which provides as follows:

 In all prosecutions for murder, the state or the defendant shall be
permitted to offer testimony as to all relevant facts and circumstances
surrounding the killing and the previous relationship existing between the
accused and the deceased, together with all relevant facts and
circumstances going to show the condition of the mind of the accused
at the time of the offense.


Tex. Code Crim. Proc. art. 38.36(a) (Vernon 2005). However, evidence offered under
article 38.36(a) must still meet the requirements of the rules of evidence in order to
be admissible. See Garcia v. State, 201 S.W.3d 695, 702 (Tex. Crim. App. 2006), cert.
denied, 127 S. Ct. 1289 (2007). Article 38.36(a) does not extend the rules of evidence
to admit otherwise inadmissible testimony. Barber v. State, 989 S.W.2d 822, 834
(Tex. App.-Fort Worth 1999, no pet.) (citing Werner v. State, 711 S.W.2d 639, 644
(Tex. Crim. App. 1986) (en banc); Henderson v. State, 906 S.W.2d 589, 597 (Tex.
App.-El Paso 1995, pet. ref'd); Richardson v. State, 860 S.W.2d 214, 216 (Tex.
App.-Fort Worth 1993, no pet.)); see Buhl v. State, 960 S.W.2d 927, 932 (Tex.
App.-Waco 1998, pet. ref'd).

 Appellant testified at trial that, in the fall of 1998, Eisenman began showing her
pornography on his computer. Appellant stated that Eisenman would belittle her, be
mean to her, and tease her when she stated that she did not want to view the
pornographic images. Appellant testified that Eisenman also attempted to get
appellant to perform various sexual acts depicted in the pornography that he would
show her. Appellant testified that Eisenman continued to view pornography after they
moved to the Houston area and would continue to ask her to "participate in
pornography" during that time. Ron Watson, a long-time family friend, also testified
that Eisenman had apparently visited a large number of pornographic web sites on
his computer.

 As part of its investigation, the Harris County Sheriff's Department took
possession of two computers found at Eisenman's apartment. When appellant
attempted to question Detective Marc Reynolds about the contents of one of the
computers, the State objected on the basis that relevancy had not been established. 
See Tex. R. Evid. 401, 403. On a bill of exception, appellant called Detective
Reynolds to testify regarding what was found on Eisenman's computer. Detective
Reynolds told the trial court that, as part of a forensic analysis of the computer,
pornographic material was located in Eisenman's computer's temporary internet files,
"meaning, that it had just browsed through, it was nothing that was downloaded to the
hard drive. It had been files that had been deleted." He stated that there were
several hundred thumbnail photographs. Detective Reynolds also testified that there
were some short video clips contained within the files. Appellant's counsel argued to
the trial court that "it's important for the jury to understand that there was, in fact, the
existence of pornography on a computer owned by Mr. Eisenman." The trial court
excluded the proffered testimony.

 Appellant now argues that "the existence of pornography and its impact on the
relationship between appellant and [Eisenman] was critical to the jury's understanding
and appreciation of the relationship of the parties and appellant's fear on the night of
May 27, 2004." She claims that Detective Reynolds's testimony "would have aided
the jury in its understanding of the appellant's allegations of past abuse and why she
acted as she did (in self-defense)," and that "evidence concerning [Eisenman's]
intense interest in pornography in his marriage would have provided the jury with a
greater understanding of the context and circumstances of the appellant's actions. 
This evidence would have incrementally furthered appellant's defensive theory."

 However, the jury was not charged on appellant's right to use self-defense
against an imminent commission of sexual assault. See Act of May 27, 1995, 74th
Leg., ch. 235, § 1 (amended 2007) (current version at Tex. Penal Code Ann. §
9.32(a)(2)(B) (Vernon Supp. 2007)). Appellant does not claim that Eisenman made
a sexual advance against her in her apartment on the date of the charged offense. 
We cannot conclude that the presence of pornographic images on the temporary
internet files of the computer supported appellant's claim that Eisenman used or
attempted to use deadly force against her. Furthermore, there is no showing by
appellant that the pornographic images were related to the shooting, that the images
were the subject of the argument that preceded the shooting, or that the images
played any part whatsoever during the events leading up to the shooting. See Booth
v. State, 679 S.W.2d 498, 502 (Tex. Crim. App. 1984) (en banc). (7)
 At most, Detective
Reynolds's proffered testimony shows that Eisenman viewed the images on his
computer in his apartment after he and appellant separated. See id.

 Appellant also claims that she was denied her right to effective cross-examination under the Sixth Amendment. However, appellant did not argue that her
constitutional right of confrontation and cross-examination demanded admission of
the evidence. See Reyna v. State, 168 S.W.3d 173, 179-180 (Tex. Crim. App. 2005). 
Appellant's arguments for admitting the evidence referenced article 38.36(a) of the
code of criminal procedure. Her arguments did not put the trial court on notice that
she was making a constitutional right of confrontation and cross-examination
argument, and it did not have an opportunity to rule upon this rationale. Therefore,
no error has been preserved for purposes of appeal on this basis. Tex. R. App. P.
33.1(a)(2)(A).

 We conclude the trial court did not abuse its discretion when it excluded
testimony about pornography found on Eisenman's computer. Appellant's fourth point
of error is overruled.

D. Omission of Testimony Regarding Eisenman's Assault of Appellant

 In her fifth point of error, appellant contends the trial court erred when it refused
to allow Watson to testify concerning statements made to him by Eisenman. Before
the jury, Watson testified that, in November 2002, he received a phone call from
Eisenman, and two days later Eisenman visited him. Describing Eisenman's
emotional behavior, either on the phone or during the visit, Watson testified that he
was "super animated, excited, just very upset." During the visit, Watson confronted
Eisenman about "his - the physicality, what had happened between [him and
appellant] physically." In response to this testimony, the State objected on the basis
of hearsay, and the trial court sustained the objection.

 Outside the presence of the jury, appellant called Watson to proffer testimony
as a bill of exception. Watson testified Eisenman called him just before Thanksgiving. 
Watson tried to calm Eisenman down because he was upset, "out of his mind." Two
days later Eisenman arrived at Watson's home and admitted to Watson that he had
pushed and shoved appellant. Eisenman was upset and crying, and Watson agreed
that Eisenman was "still kind of in an agitated, excited state." Watson said that
Eisenman indicated that he put appellant against the wall and had messed up the
apartment. Eisenman also told Watson that he broke a crystal picture frame that the
Watsons had given them. According to Watson, Eisenman did not use the words
"struck" or "hit" in telling him what had happened. On cross-examination, Watson
testified that the argument followed Eisenman's confronting appellant about emails
he had discovered between appellant and another man. The State's hearsay
objection was challenged by appellant on the basis of present-sense impression,
excited utterance, and a statement against penal interest. See Tex. R. Evid. 801(1),
(2), & (24).

1. Present Sense Impression

 The hearsay rule does not exclude "[a] statement describing or explaining an
event or condition made while the declarant was perceiving the event or condition, or
immediately thereafter." Id. at rule 801(1). The safeguards of reliability for a
statement of the declarant's present sense impression include: (1) the report at the
moment of the thing then seen, heard, etc., is safe from any error from defect of
memory of the declarant; (2) there is little or no time for a calculated misstatement;
and (3) the statement will usually be made to another (the witness who reports it) who
would have the equal opportunity to observe and hence to check a misstatement. 
Esparza v. State, 31 S.W.3d 338, 342 (Tex. App.-San Antonio 2000, no pet.) (citing
Rabbani v. State, 847 S.W.2d 555, 560 (Tex. Crim. App. 1992) (en banc)). We
conclude that Watson's testimony concerning what Eisenman said to him at least two
days after the event in question was not a present sense impression. See Ferguson
v. State, 97 S.W.3d 293, 297-98 (Tex. App.-Houston [14th Dist.] 2003, pet. ref'd)
(citing Wood v. State, 18 S.W.3d 642, 651-52 (Tex. Crim. App. 2000)).

2. Excited Utterance

 Rule 803(2) excludes from hearsay "a statement relating to a startling event or
condition made while the declarant was under the stress of excitement caused by the
event or condition." Tex. R. Evid. 803(2). Appellant claims Eisenman's statements
to Watson constituted excited utterances because Eisenman "was still in an agitated,
angry, super animated and emotional state when he met with" Watson. However,
Eisenman's emotional state-standing alone-is not sufficient to demonstrate that his
statements at the time were thereby excited utterances. See Martinez v. State, 178
S.W.3d 806, 814-15 (Tex. Crim. App. 2005). Eisenman left appellant and went to his
sister's residence in Austin. At least two days after he called Watson, Eisenman
visited him. There is no evidence in the record that Eisenman was "in the instant grip
of violent emotion, excitement or pain" immediately before or during his recounting
of the events. Id. at 815. Without further evidence that Eisenman had no time or
opportunity to calm himself and reflect upon the two-day-old events, this Court cannot
conclude that his statements to Watson fit within the excited utterance exception to
the hearsay rule. See id. at 815 (citing Zulani v. State, 97 S.W.3d 589, 595 (Tex. Crim.
App. 2003)); Apolinar v. State, 155 S.W.3d 184, 186-87 (Tex. Crim. App. 2006)
(providing that if the declarant had a meaningful opportunity to reflect, the trial court
should be justified in finding that the declarant's statements were not excited
utterances).

3. Statements Against Penal Interest

 Appellant also contends that Eisenman's statements to Watson were
admissible as statements against Eisenman's penal interest under rule of evidence
803(24). See Tex. R. Evid. 803(24). She argues that Eisenman made statements to
Watson which were clearly against his interest and that there can be no suggestion
that Eisenman was motivated by anything other than his desire to confide in his long-time friend.

 A statement against interest is one "which was at the time of its making so far
contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject
the declarant to civil or criminal liability . . . that a reasonable person in declarant's
position would not have made the statement unless believing it to be true." Id. To be
admissible, a statement tending to expose the declarant to criminal liability must be
corroborated by circumstances clearly indicating its trustworthiness. Id. The courts
have used the following two-part test to determine the admissibility of a statement
under rule 803(24): (1) the trial court must determine whether the statement tends
to expose the declarant to criminal liability--the statement must be self-inculpatory;
and (2) the trial court must determine if there is any corroborating evidence that
indicates the statement is trustworthy. Dewberry, 4 S.W.3d at 751; Bingham v. State,
987 S.W.2d 54, 57 (Tex. Crim. App. 1999); In re U. G., 128 S.W.3d 797, 800 (Tex.
App.-Corpus Christi 2004, pet. denied); Esparza, 31 S.W.3d at 342.

 First, we cannot conclude that Eisenman's statements were self-inculpatory;
tending to expose Eisenman to criminal liability. See Hernandez v. State, 171 S.W.3d
347, 356 (Tex. App.-Houston [1st Dist.] 2005, pet. ref'd). In this case, the only
significant inclupatory statements made by Eisenman to Watson pertained to
Eisenman's pushing and shoving appellant and breaking a crystal picture frame in
November 2002. Eisenman did not tell Watson that in November 2002 he slapped
appellant in the face and punched her in the side of her head with his fist causing
appellant to fall back onto the bed--the more serious actions appellant testified to at
trial.

 Second, in reviewing evidence of corroboration of the statement to determine
whether the statement is trustworthy, the courts consider a number of non-exclusive
factors including the following: (1) whether the guilt of a declarant is inconsistent with
the guilt of a defendant; (2) whether the declarant was so situated that he might have
committed the crime; (3) the timing of the declaration; (4) the spontaneity of the
declaration; (5) the relationship between the declarant and the party to whom the
statement is made; and (6) the existence of independent corroborative facts. See
Dewberry, 4 S.W.3d at 751; Bingham, 987 S.W.2d at 58. Evidence that serves to
"undermine the reliability of the statement as well as evidence corroborating its
trustworthiness may be considered," so long as we do not weigh the credibility of the
witnesses. Bingham, 987 S.W.2d at 58.

 In this case, Eisenman's actions in regard to appellant's self-defense claim are
at issue, not his guilt. See Dewberry, 4 S.W.3d at 751. And while Eisenman's actions
of pushing and shoving appellant and breaking a crystal picture frame in November
2002, are not necessarily inconsistent with appellant's self-defense claim, Eisenman
did not tell Watson about the more serious allegations appellant leveled against him. 
See Hernandez, 171 S.W.3d at 356. On May 27, 2004, appellant and Eisenman were
in the apartment together, and thus, Eisenman was so situated that he might have
acted in a similar manner as he was alleged to have acted in November 2002. See
Dewberry, 4 S.W.3d at 751. However, the timing and the spontaneity of the
statements do not indicate trustworthiness. See id. Eisenman was upset and called
Watson. He visited him later and talked about the incident that happened at least two
days earlier. We cannot conclude that Eisenman's statements to Watson were
spontaneous--happening or arising without apparent external cause. See id. 
Additionally, the statements were made to a friend who Eisenman might have reason
to believe could be called to testify against him. Finally, Eisenman's statements were
corroborated by appellant's own testimony. However, appellant's testimony was more
helpful to her than Eisenman's statements to Watson. These circumstances do not
clearly indicate the trustworthiness of Eisenman's statement. See Auston v. State, 892
S.W.2d 141, 144 (Tex. App.-Houston [14th Dist.] 1994, no pet.) (citing Cunningham
v. State, 877 S.W.2d 310, 314 (Tex. Crim. App. 1994) ("[W]here the factors indicating
untrustworthiness are at least equal to or greater than those offered to support the
trustworthiness of the alleged statement, we cannot . . . find that corroborating
circumstances clearly indicate trustworthiness.")).

 Because neither part of the test was satisfied, we conclude that Eisenman's
statement falls outside the exception for statements against penal interest. Therefore,
appellant has not demonstrated how the trial court's exclusion of Watson's testimony
on this basis was an abuse of discretion.

4. Article 38.36(a)

 Appellant additionally claims that Eisenman's statements to Watson were
admissible under article 38.36(a) of the code of criminal procedure. See Tex. Code
Crim. Proc. Ann. art. 38.36(a) (Vernon 2005). However, this statute "in no way
broadens or otherwise affects the rules of evidence which apply, or the way in which
they apply in any given homicide case." Rogers v. State, 183 S.W.3d 853,860 (Tex.
App.-Tyler 2005, no pet.) (citing Fielder v. State, 756 S.W.2d 309, 318 (Tex. Crim.
App. 1988); Bush v. State, 958 S.W.2d 503, 505 (Tex. App.-Forth Worth 1997, no
pet.)); see Buhl, 960 S.W.2d at 932. As we noted in appellant's fourth point of error,
evidence offered under article 38.36(a) must still meet the requirement of the rules
of evidence in order to be admissible. See Garcia, 201 S.W.3d at 702. In that
respect, we have determined the evidence does not fall under an exception to the
hearsay rule. Also, rule of evidence 404(b) would prohibit appellant from introducing
evidence for the sole purpose of showing that, at the time of the charged offense,
Eisenman acted in conformity with his past bad character towards appellant and thus
precipitated appellant's actions. See Smith v. State, 5 S.W.3d 673, 678 (Tex. Crim.
App. 1999) (citing Tex. R. Evid. 404(b); Montgomery, 810 S.W.2d at 386); Whitmire,
183 S.W. 3d at 529.

 Thus, we conclude that the trial court did not abuse its discretion in refusing to
admit Watson's proffered testimony into evidence. We overrule appellant's fifth point
of error.

E. Omission of Videotaped Statement

 Under her sixth point of error, appellant claims the trial court erred when it
refused to admit her videotaped statement taken by Detective Larry Davis at the
Harris County Sheriff's Department. The videotaping lasted approximately three
hours, beginning between 5:00 a.m. and 5:30 a.m., the morning following the
shooting. The interview itself comprised approximately an hour and a half of the tape. 
The remaining portion of the videotape showed appellant alone in the room before
and after the interview.

 During the guilt/innocence phase of the trial, at the end of appellant's testimony
and after the trial court had cautioned appellant not to mention the videotape,
appellant's counsel requested a bench conference. The following colloquy occurred:

 [Defense]: I know that the [c]ourt has indicated that the videotape is
not to be referenced in any questioning, but what I did want
to do was give . . . the jury the opportunity to see the
videotape, maybe not with the audio on, but to see what
[appellant] looked like that night when she was being
questioned. It's just like a photograph.

 

 [State]: Huh-uh. No, it's not.

 

 [Court]: You have to bring me case law on that.

 

 [Defense]: Okay, well, I would just like to make a prooffer [sic] on that,
then. I'm not going to ask for any questions, so if we are
going to retire the jury, if you don't mind me just presenting
the tape and asking her if that's the way she looked on that
night, and then I'll just make the proffer to you.

 

 [Court]: No, I'm going to deny that request regarding the video. I'm
denying that request.

 

 [Defense]: Okay.

 Although counsel did not proffer the videotape at this time, the record reveals
that the trial court had reviewed the excluded videotape following an earlier pre-trial
hearing on appellant's motion to suppress the statement. Thus, the substance of the
evidence had otherwise been made known to the trial court. See Guidry v. State, 9
S.W.3d 133, 153 (Tex. Crim. App. 1999) ("Absent a showing of what such testimony
would have been, or an offer of a statement concerning what the excluded evidence
would show, nothing is presented for review."); see also Tex. R. Evid. 103(a)(2). 
Furthermore, at trial, although appellant did not actually recite the specific rule of
evidence she was relying upon, she appears to have been seeking to admit the
videotaped statement, without audio, to establish her appearance for impeachment
purposes. See Reyna, 168 S.W.3d at 176 ("[T]he party complaining on appeal about
a trial court's admission, exclusion, or suppression of evidence must, at the earliest
opportunity, have done everything necessary to bring to the judge's attention the
evidence rule or statute in question and its precise and proper application to the
evidence in question.").

 On appeal, appellant contends that she sought to introduce the videotape
during the guilt/innocent phase of the trial to show the jury appellant's appearance
and demeanor; to aid the jury in its assessment of her. Appellant claims that, by
viewing the video, the jury would have observed a withdrawn and gaunt-looking
individual. Appellant contends that she was harmed by the exclusion of this evidence
because the jury was called upon to decide her self-defense claim without
photographic evidence which contradicted how police described her. We disagree.

 The trial court has broad discretion in admitting video recordings, and its action
will not be disturbed absent an abuse of that discretion. See Burdine v. State, 719
S.W.2d 309, 316 (Tex. Crim. App. 1986) (en banc). In this case, like the trial court,
we have reviewed appellant's videotaped statement. During the interview, appellant
appeared calm and cooperative. She listened to the interviewers and responded to
them, at times seeming to wipe away tears. Appellant sat on a chair and drank from
a cup. She had a blanket wrapped around her. When appellant stood or rearranged
the blanket, bruises were apparent on her legs. The trial court had, however,
admitted into evidence photographs that purported to depict appellant's physical
appearance. Similar bruising was noted in the photographs. Appellant appeared thin
and tired in both the photographs and the videotape. Appellant does not indicate how
the videotaped representation differed from the photographic depiction.

 Appellant also refers this Court to testimony that described appellant as a
"zombie" rocking back and forth, and her demeanor as "distraught," "pacing," and not
"calm." Officers, however, testified that appellant was not crying when they arrived
at the apartment complex; that she was very calm and cooperative. Further, in the
videotaped recording, when the officers left the room, appellant remained in the room,
ate food provided by the officers, read a magazine, and when she moved to the floor
she continued to read until, approximately one hour later, she left the room. The
videotape does not support appellant's contention that her actions were "zombic," that
she rocked back and forth, was "distraught," that she "paced," and was not "calm." 
We cannot conclude that the videotape provided evidence which contradicted how
police described her. Furthermore, during trial appellant presented evidence
regarding her demeanor and appearance, and she also had an opportunity to cross-examine the officers who described her as calm and cooperative. Accordingly, we
conclude appellant has failed to show that the trial court abused its discretion in
refusing to admit into evidence the videotaped recording of her statement. 
Appellant's sixth point of error is overruled.F. Omission of Testimony Regarding Appellant's Pregnancy

 Appellant contends in her seventh point that the trial court erred when it
excluded her testimony about Eisenman's alleged indifference to her pregnancy and
the problems she encountered just before her son's birth. Appellant again claims that
this evidence was admissible under article 38.36(a). Tex. Code Crim. Proc. Ann. §
38.36 (Vernon 2005). Appellant asserts that her testimony concerning her
mistreatment by Eisenman during her pregnancy would have aided the jury in its
understanding of appellant's allegations of past abuse and why she acted as she did.

 As the State notes, for a self-defense claim appellant must have had a
reasonable belief that Eisenman was using or attempting to use deadly force against
her. See Act of May 27, 1995, 74th Leg., ch. 235, § 1 (amended 2007) (current
version at Tex. Penal Code Ann. § 9.32(a)(2)(A) (Vernon Supp. 2007)). However, at
no time during appellant's bill of exception on this matter did appellant testify that
Eisenman had ever used or attempted to use deadly force against her. Therefore, the
proffered evidence was not probative of the alleged reasonableness of appellant's
belief that Eisenman had used, was using, or even might use deadly force at the time
that she shot and killed Eisenman. The testimony showed Eisenman's apparent
unwillingness to assist appellant at the time her contractions may have started. The
testimony did not present any justification for appellant's actions in taking Eisenman's
life. Moreover, the jury heard testimony concerning Eisenman's purported attitude
towards appellant's pregnancy and birth of their child. The State contends, and we
agree, that the trial court did not abuse its discretion in concluding that the proffered
testimony of appellant set forth in the bill had little, if any, additional probative value
in this case. Therefore, we conclude that the trial court did not abuse its discretion
in excluding this portion of appellant's testimony. Appellant's seventh point of error
is overruled.

G. Omission of Testimony Regarding Civil Lawsuits

 By her eighth point of error, appellant contends that the trial court erred when
it refused to allow her to cross-examine Tom Eisenman, the deceased's father, about
civil lawsuits (child custody and wrongful death) that he had pending against
appellant. Appellant argued that Mr. Eisenman's testimony was relevant to show his
bias and motive for testifying as he had. During the bill of exception, appellant again
asserted the relevance of the testimony because it went to the "heart of his testimony
in terms of showing a bias and motive and his reason for testifying the way he does."

 On appeal, appellant's sole contention is that she was denied her constitutional
right to conduct cross-examination and that she was harmed by this limitation. 
Appellant did not argue to the trial court that her Sixth Amendment right to confront
or cross-examine demanded admission of the evidence. See Reyna, 168 S.W.3d at
179-180. At trial, appellant asserted only that Mr. Eisenman's testimony regarding the
civil lawsuits should be admitted to show his bias and motive. The trial court
sustained the State's objection. Appellant's arguments did not put the trial court on
notice that she was making a constitutional right of confrontation and/or cross-examination argument, and it did not have an opportunity to rule upon this rationale. 
Therefore, no error has been preserved for purposes of appeal on this basis. We
overrule appellant's eighth point of error.

H. Omission of Testimony Regarding Prior, Alleged Abusive Relationship

 Appellant contends, by her ninth point, that the trial court erred when it failed
to grant her request for a mistrial when the State asked Watson whether he was
aware that appellant had been in an abusive relationship prior to dating Eisenman. 
When the State asked this question, however, the trial court immediately sustained
appellant's hearsay objection and instructed the jurors to disregard the question and
not to consider it for any purpose. Nonetheless, appellant asserts that the instruction
failed to erase the intended suggestion of prior abuse. She claims that this evidence
could have swayed the jury in finding against appellant, that the defensive claims
presented by appellant were seriously hampered, and that her substantial rights
affected. We disagree.

 The trial court's denial of the motion for a mistrial is reviewed under an abuse
of discretion standard. Ladd v. State, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999).
"When objectionable testimony is elicited, inadvertently or deliberately, an appellate
court presumes the jury will follow instructions to disregard the evidence." Drake v.
State, 123 S.W.3d 596, 604 (Tex. App.-Houston [14th Dist.] 2003, pet. ref'd) (quoting
Gardner v. State, 730 S.W.2d 675, 696 (Tex. Crim. App. 1987) (en banc)). This is true
except in extreme cases where it appears that the evidence is clearly calculated to
inflame the minds of the jury and is of such a character as to suggest the impossibility
of withdrawing the impression produced on their minds. Gardner, 730 S.W.2d at 697. 
A court should review the particular facts of the case in determining whether a given
error requires a mistrial. See Ladd, 3 S.W.3d at 567.

 That appellant had an abusive relationship prior to dating Eisenman was
undoubtedly hearsay in this instance and inadmissable on that basis. However, this
unembellished bare fact "was not so inflammatory as to undermine the efficacy of the
trial court's instruction to disregard it." See Gardner, 730 S.W.2d at 697. We,
therefore, conclude that trial court did not abuse its discretion in denying appellant's
motion for mistrial. Appellant's ninth point of error is overruled.

I. Omission of Testimony Regarding Appellant's Medical Condition

 In point of error ten, appellant contends that the trial court erred when it
excluded testimony concerning appellant's medical condition. Specifically, appellant
claims that the trial court erred when it instructed the jury to disregard appellant's
mother's testimony about appellant having a miscarriage and seeing the doctor
sometime after she was released from jail following her arrest.

 Following this testimony and outside the presence of the jury, appellant's
counsel explained that she understood that the State's motion in limine related only
to two previous miscarriages and not to this miscarriage--the one following the
shooting. Appellant's counsel also argued that appellant had mentioned the fact that
she was pregnant during direct examination. The State responded that although this
pregnancy had been mentioned in appellant's statement, it had not been admitted at
trial. Furthermore, appellant had not testified that she was pregnant, had a
miscarriage, or had gone to a doctor.

 Now on appeal, appellant argues that the State "opened the door" through
appellant's sister's testimony that appellant told her she was pregnant as a result of
Eisenman sexually assaulting her and that she had a miscarriage because he had
pushed her. (8) See Mares v. State, 52 S.W.3d 886, 890 (Tex. App.-San Antonio 2001,
pet. ref'd) ("Under the opened-door doctrine, a defendant cannot intentionally broach
a subject and then complain when the subject is subsequently pursued by the
State."). Appellant did not, however, object on this basis to the trial court. See Tex.
R. App. P. 33.1(a)(1) (providing that a timely objection to trial court is required to
preserve complaint for appeal). Appellant argued only that testimony regarding this
pregnancy and miscarriage was not covered by the motion in limine and suggested
appellant testified regarding this pregnancy. Therefore, appellant has not preserved
this argument for appeal. We overrule appellant's tenth point of error.

V. Motion for New Trial

 Finally, in her eleventh point, appellant claims that a new trial should have been
granted because of newly discovered evidence. We conclude, however, that the trial
court did not abuse its discretion in denying the motion on this ground.

 A motion for new trial based on newly discovered evidence is addressed to the
sound discretion of the trial court, and its decision should not be disturbed on appeal
absent a clear abuse of discretion. Jones v. State, 711 S.W.2d 35, 36 (Tex. Crim.
App. 1986); Dedesma v. State, 806 S.W.2d 928, 934 (Tex. App.-Corpus Christi 1991,
pet. ref'd).

 To show that the trial court abused its discretion, the record must
indicate that (1) the newly discovered evidence was unknown to the
movant at the time of trial, (2) the movant's failure to discover the
evidence was not due to his want of diligence, (3) the materiality of the
evidence is such as would probably bring about a different result in
another trial, and (4) the evidence is admissible, and not merely
cumulative, corroborative, collateral, or impeaching.

Dedesma, 806 S.W.2d at 934 (citing Drew v. State, 743 S.W.2d 207, 226 (Tex. Crim.
App. 1987) (en banc); Sawyer v. State, 778 S.W.2d 541, 545 (Tex. App.-Corpus
Christi, 1989, pet. ref'd)).

 "Motions for new trial based on newly discovered evidence or newly available
evidence are not favored and are viewed with great caution." Id. (citing Drew, 743
S.W.2d at 225). "The credibility of witnesses and the probable truth of the new
evidence are matters for the trial court's determination." Id. (citing Todd v. State, 601
S.W.2d 718, 721 (Tex. Crim. App. 1980)). "In ruling on the motion, the trial court may
consider the evidence adduced at trial, affidavits, and the testimony at the hearing on
the motion for new trial." Id. (citing Williams v. State, 375 S.W.2d 449, 451 (Tex. Crim.
App. 1964)). Should it appear to the trial court that, under the circumstances, the
weight or credibility of the new evidence probably would not bring about a different
result in a new trial, it is within the discretion of the trial court to deny the motion. 
Jones, 711 S.W.2d at 36-37; Dedesma, 806 S.W.2d at 934.

 During trial, appellant testified that during November 2002, she and Eisenman
had an argument while they were living in apartment unit 2104. During the argument,
Eisenman became physical with her and caused damage in the unit. Watson testified
that he saw a hole in a wall in that same unit. Appellant testified that she later fixed
the damaged area.

 The State called Jennifer Hines, the manager at the apartment complex, who
testified that after walking through the apartment, she did not notice any defects in
unit 2140 when the Eisenmans left. Also during trial, Rogelia Bonilla, the assistant
manager at the apartment complex, testified that when appellant and Eisenman
vacated the apartment they shared prior to their separation, he did not document any
damage. However, on cross-examination Bonilla agreed that if a resident's repair of
a wall was done nicely and did not require any additional work, it could go unnoticed. 
During final argument, challenging appellant's credibility, the State referred to the
testimony of Bonilla and Hines.

 Following Bonilla's trial testimony, appellant filed a motion seeking access to
unit 2104. Although the trial court did not rule on the motion because of privacy
concerns of the then-current resident, it told appellant she could try to gain entry on
her own. Appellant was unable to do so until after the completion of trial.

 At the hearing on appellant's motion for new trial, Carrie Wellmaker, a private
investigator, testified when she did gain access to the unit she was able to locate an
area where a round base magnet stuck to the guest bedroom wall, indicating that
repairs had been made to that wall. During cross-examination, Wellmaker indicated
she was not able to definitively determine when the metal object or item was placed
in the wall. The State argued that appellant had not met the burden of showing that
this evidence would produce a different result. The trial court denied appellant's
motion for new trial.

 The trial court could have concluded that the evidence was merely cumulative,
corroborative, collateral, or impeaching. See Dedesma, 806 S.W.2d at 934. Further,
hearing testimony that an area in the unit's wall had been repaired, the trial court
could have concluded that the wall had been damaged and that appellant had
repaired it. Based on the testimony, however, the trial court could also have
concluded that the time period of the repair remained uncertain. Thus, we cannot say
that the trial court abused its discretion in denying appellant's motion for new trial on
this ground as it appears that, under the circumstances, the weight or credibility of the
new evidence probably would not bring about a different result in a new trial. See
Jones, 711 S.W.2d at 36-37; Dedesma, 806 S.W.2d at 934. Appellant's eleventh point
of error is overruled.VI. Conclusion

 We affirm the judgment.

 

 NELDA V. RODRIGUEZ

 Justice


Do not publish. 

Tex. R. App. P. 47.2(b).


Memorandum Opinion delivered and 

filed this 10th day of January, 2008.
1. The jury was instructed on three justifications: necessity, self-defense, and defense of a third person.
2. "Secretary" is defined as "a writing desk with a top section for books." Merriam-Webster On-Line Dictionary, available at http://www.merriamwebster.com/dictionary/secretary (last visited Jan. 6,
2008).
3. Detective Marc Reynolds, who made an initial observation that appellant was not bruised, did not
look for evidence of bruising thereafter and admitted that bruising does not always appear immediately after
an injury is sustained. Vonda Harvey, appellant's mother, testified that, on May 29, 2004, after appellant was
released from jail, she limped into their home, had bruises covering her legs and was in great pain. 
Photographs of appellant that revealed bruises on the front and back of her legs were also admitted as
exhibits at trial.
4. Appellant testified that she later disposed of some, but not all, of the items in a dumpster on the other
side of the apartment property. In her statement to the police, however, appellant told the officers that she
did not throw anything away.
5. A "[d]eadly weapon" is defined as a "firearm . . . manifestly designed, made, or adapted for the
purpose of inflicting death or serious bodily injury" or "anything that in the manner of its use or intended use
is capable of causing death or serious bodily injury." Tex. Penal Code Ann. § 1.07(17) (Vernon Supp. 2007).
6. Appellant also claims she shot Eisenman in defense of her son. However, appellant's cites us to no
evidence in the record, and we find none, that Eisenman attempted to use or used deadly force against their
child.
7. The predecessor to article 38.36(a), section 19.06 of the penal code which was relied on in Booth
v. State, 679 S.W.2d 498, 502 (Tex. Crim. App. 1984), was virtually identical to the current version, except
that it applied to prosecutions for manslaughter as well as murder. Smith v. State, 5 S.W.3d 673, 677 (Tex.
Crim. App. 1999); see Act of May 28, 1973, 63rd Leg., R.S., ch. 426, 1973 Tex. Gen. Laws 1123, 1124.

8. In response to the State's questions, appellant's sister testified as follows:


 Q. Now, at some point during the time you spent with your sister, she
made the statement to you, "I'm pregnant"; is that correct?"

 

 A. Yes, ma'am.

 

 Q. Did she tell you she was pregnant as a result of Drew sexually
assaulting her?

 

 A. Yes, ma'am.

 

 * * * * *

 

 Q. When you were talking with your sister that night prior to the police's
arrival, did she tell you that she had had a miscarriage because
Drew had pushed her?

 

 A. Yes, ma'am, she did.

 

 Q. Did she say when?

 

 A. I don't think so.

 

 Q. Did she tell you that Drew had pushed her one time before -

 

 A. Yes.

 

 Q. - after they had separated?

 

 A. I don't know if it was after.

 

 Q. But she said, in reference to Drew pushing her once before?

 

 A. To cause that miscarriage, yes.